ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
————————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————————

No. 22-3084
————————————————

UNITED STATES OF AMERICA, Appellee,

v.

LUCAS DENNEY, Appellant.

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BENET J. KEARNEY
* DAVID B. GOODHAND, DC Bar 438844
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
Cr. No. 22-cr-7060 (RDM)    (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee states as follows:

## Parties and Amici

The parties to this appeal are appellant, Lucas Denney, and appellee, the United States of America.

## Rulings Under Review

Denney challenges his sentence, claiming the district court improperly enhanced his Sentencing Guidelines offense level. *See* U.S.S.G. §§ 2A2.2(b)(1), 2A2.2(b)(2)(B). These rulings are unreported but reproduced in Denney's Appendix, at 14-31.

## Related Cases

Appellee is unaware of any related cases.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are reproduced in the addendum of this brief.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE ............................................ 1

    Background ........................................................................ 2

        Denney's Planning for the January 6 Riot ................................ 2

        Denney's Participation in the January 6th Riot ........................ 6

        Denney's Plea and Sentencing .................................................. 9

SUMMARY OF ARGUMENT ...................................................... 12

ARGUMENT .......................................................................... 13

    The District Court's Below-Guidelines Sentence Is
    Procedurally Correct. ...................................................... 13

        A.   Applicable Legal Principles and Standard of Review ........ 14

        B.   The District Court Properly Applied the More-Than-
             Minimal-Planning Enhancement. ..................................... 15

        C.   The District Court Properly Applied the Use-of-a-
             Dangerous-Weapon Enhancement. ................................... 24

CONCLUSION ...................................................................... 29

# TABLE OF AUTHORITIES*

**Cases**

*Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265 (1995)................................................................22

*Gall v. United States*, 552 U.S. 38 (2007) ...............................14

*In re Sealed Case*, 552 F.3d 841 (D.C. Cir. 2009) ...................28

*Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301 (D.C. Cir. 2021) .............2

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005).........................22

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ...............27

\* *United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019) .................14, 25

*United States v. Coombs*, 823 F. App'x 613 (10th Cir. 2020) .................22

\* *United States v. Foster*, 898 F.2d 25 (4th Cir. 1990) .......................20, 23

*United States v. Graham,* 275 F.3d 490 (6th Cir. 2001).........................22

*United States v. Kanu-Bradley*, 2022 WL 1055179 (5th Cir. April 8, 2022)..................................................22, 23

*United States v. Kim*, 23 F.3d 513 (D.C. Cir. 1994)................................16

*United States v. Love*, 593 F.3d 1 (D.C. Cir. 2010) .................................25

*United States v. Mellen*, 393 F.3d 175 (D.C. Cir. 2004).........................16

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

*United States v. Moore*, 225 F.3d 637 (6th Cir. 2000) ............................ 20

*United States v. Reyes-Santiago*, 804 F.3d 453 (1st Cir. 2015) ................ 2

*United States v. Russell*, 600 F.3d 631 (D.C. Cir. 2010) ........................ 14

*United States v. Simpson*, 760 F. App'x 931 (11th Cir. 2019) .......... 22, 23

*United States v. Smith*, 953 F.2d 1060 (7th Cir. 1992) ......................... 19

*United States v. Tapia*, 59 F.3d 1137 (11th Cir. 1995) ........................... 22

*United States v. Washington*, 670 F.3d 1321 (D.C. Cir. 2012) .............. 14

**Other References**

18 U.S.C. § 111(a)(1)........................................................1

18 U.S.C. § 3553(a)(1)................................................10, 11

18 U.S.C. § 3553(a)(6)....................................................12

U.S.S.G. § 1B1.1..............................................................24

U.S.S.G. § 2A2.2....................................................15, 24, 25

U.S.S.G. § 2A2.2(b)(1).........................9, 14, 15, 19, 21, 22, 23

U.S.S.G. § 2A2.2(b)(2)(B)..............................................9, 23

U.S.S.G. § 2B1.1(b)(4)....................................................20

U.S.S.G. § 2B1.1(b)(4)(A)................................................16

U.S.S.G. § 2F1.1(b)(2)(A)................................................16

U.S.S.G. § 3A1.4............................................................22

Fed. R. App. P. 4(b)(1)(A)(i)..............................................2

Fed. R. App. P. 10(a).........................................................2

Fed. R. App. P. 26(a)(1) .....................................................2

*Oxford English Dictionary* 466 (1st ed. 1933) .........................22

# ISSUES PRESENTED

I. Whether the district court erroneously enhanced Denney's base offense level pursuant to U.S.S.G. § 2A2.2(b)(1) (more than minimal planning) where Denney engaged in significant planning for his aggravated assault of Sergeant K.K. by, among other things, soliciting donations for his trip to D.C., recruiting fellow "fight[ers]" to accompany him, and procuring, for example, pepper spray, all so he could "tak[e] back the country on the 6th"?

II. Whether the district court erroneously enhanced Denney's base offense level pursuant to U.S.S.G. § 2A2.2(b)(2)(B) (use of a dangerous weapon) where, among other things, Denney admitted at his change-of-plea hearing that he attacked Sergeant K.K. with "a dangerous weapon"?

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 22-3084

————————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

LUCAS DENNEY,                                Appellant.

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————

BRIEF FOR APPELLEE

————————————————

## COUNTERSTATEMENT OF THE CASE

After participating in the January 6, 2021, attack on the United

States Capitol, appellant, Lucas Denney, pleaded guilty to assaulting a

federal officer with a dangerous or deadly weapon, in violation of 18

U.S.C. § 111(a)(1), (b) (3/17/22:38).[1] On October 14, 2022, the Honorable

_____

[1] Other than the district court docket entries, Denney included only the sentencing-hearing transcript in his Appendix (App.). Citations to additional record materials are to the transcripts (identified by date) and

(continued . . .)

Randolph D. Moss entered his judgment, sentencing Denney to 52 months' imprisonment followed by three years' supervised release (App. 19, 102). Denney appealed on October 31, 2022 (App. 19).[2]

## Background[3]

### *Denney's Planning for the January 6 Riot*

Following the 2020 presidential election, Denney, the self-proclaimed president of a Texas-based militia called the Patriot Boys of North Texas, began planning a trip to Washington, D.C. (ECF #60-1, at

---

pleadings filed on the electronic docket (identified by ECF #). *See* Fed. R. App. P. 10(a) (record on appeal includes "original papers" filed in district court and "transcript[s]").

[2] Though it appears Denney filed his notice of appeal at least one day late, *see* Fed. RR. App. P. 4(b)(1)(A)(i), 26(a)(1), the United States is not asking this Court to dismiss his appeal. *See United States v. Reyes-Santiago*, 804 F.3d 453, 458 (1st Cir. 2015) ("every circuit to decide the issue . . . has concluded that Rule 4(b) is a claims-processing rule and, hence, may be waived or forfeited"); *cf. Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301, 1310 (D.C. Cir. 2021).

[3] Because Denney's plea did not include a Statement of the Offense, in advance of his sentencing the district court indicated that an evidentiary hearing might be necessary to resolve his objections to the Probation Office's Guidelines calculations (see 7/21/22:8-9). Before Denney's sentencing, however, the parties submitted a 22-page Joint Statement of Offense "to which [they] agreed and stipulated" (ECF #69; see ECF #60-1). Our "Background" section thus relies on these agreed-upon facts.

3). Noting that "Trump himself is calling for a big protest in DC on January 6th," in late December 2020 Denney sent a Facebook message to his codefendant, Donald Hazard; Denney encouraged Hazard to join him in D.C., declaring, "[i]f you can go, it's paid for" (*id.* at 5). On Christmas day, Hazard and Denney then exchanged Facebook messages: Denney reiterated that Hazard's trip to D.C. was "paid for," adding that he was "making [Hazard] a sergeant at arms," which meant Hazard would "watch[ ] [Denney's] back" and provide "security" (*id.* at 6). Denney also explained that, although he could not tell Hazard "everything" he knew "over media,"[4] January 6th was going to be "big" and they would be "linking up with [the] [P]roud [B]oys" (*id.*). The next day, Denney confirmed that "DC is definitely on," noting he had received a $1,000 "donation" for the trip (*id.*). Denney thus encouraged Hazard to recruit

---

[4] In his social-media communications, Denney repeatedly indicated his belief that such communications were monitored. E.g., ECF #60-1, at 7 ("I wish I could tell you more but I can't over messenger"); *id.* at 14 ("I can't tell you everything over Facebook here but I can say Trump will stay President"); *id.* at 16 ("we have special plans that I can't say right now over Facebook").

others: "If you know any other guys that can go that[']s like us an[d] will fight, we could use them" (*id.* at 6-7).[5]

On December 29, Denney sent several Facebook messages to another user, emphasizing that his Patriot Boys would be "linking up with thousands of Proud Boys and other militia" on January 6 and exclaiming, "it's going to be a fight" (ECF# 60-1, at 8). As Denney explained, January 6 was "the day that Congress is going to try and certify the electoral college" (*id.*). Denney predicted that if Vice-President Pence rejected the electoral college votes, "ANTIFA and BLM [will] start rioting," adding "[t]hat's why Trump has called everyone there to fight back and show support" (*id.* at 8-9). Denney further declared, "Biden ain't getting into office" (*id.* at 8).

Later that same day, in another series of Facebook messages, Denney emphasized how much "organiz[ing]" he had been doing in preparation for his D.C. trip and specifically noted that he was working to secure "equipment" and "supplies" for his "guys":

---

[5] Denney also tried to recruit others himself. In late-December, for example, he sent a series of Facebook messages to another user, telling him "[t]his [i.e., January 6] is the big one" (ECF #60-1, at 7).

I'm going to DC. Leaving on the 4th with a big group of my guys. Big rally on the 6th. Been taking all day everyday to organize and make sure everyone has the right equipment and supplies. (ECF #60-1, at 8; *see also id.* at 10 ("Been really busy organizing this trip[.]".)

Later, Denney offered to help codefendant Hazard "get a helmet and pick up some other gear," adding that he had already gotten each of them "a bottle of police grade pepper spray" and that he was "gonna have" a "vest" for Hazard (*id.* at 9; *see also id.* at 13 ("bought a couple cans of pepper spray earlier and one vest")).[6]

As the electoral-college certification approached, Denney exulted in several Facebook posts about the impending battle, declaring at the end of December that he could not "wait to be in the middle of it on the front line on the 6th" (ECF #60-1, at 12). Two days later, Denney announced that he and his "guys" were leaving "for DC to be in the fight on the 6th," adding it "will get Western" (*id.* at 14). As Denney explained, although those who had purportedly "rigged th[e] election" may have thought "we

---

[6] Denney also solicited donations on Facebook "to get two helmets and stab proof vest[s] that two guys need" (ECF #60-1, at 11; *see also id.* at 10 ("trying to make sure all my guys have the right equipment they need")).

[we]re just going to roll over and let that happen," "we will be taking back the country on the 6th" (*id.* at 14-15).[7]

### *Denney's Participation in the January 6th Riot*

Early in the morning of January 6, Denney explained in a Facebook post that President Trump would be speaking "to us" around 11 a.m. and "then we march to the [C]apit[o]l and after that we have special plans that I can't say right now over Facebook" (ECF #60-1, at 16). Denney thus exhorted his followers to "keep an eye on [his] Facebook for live videos," which he would be posting "when we're not fighting" (*id.*).

True to his word, Denney engaged in significant amounts of "fighting" on January 6 as he repeatedly – and violently – attempted to breach the restricted-area zone established by the U.S. Capitol Police to protect the Capitol, its grounds, and the Vice-President.[8] For example, in the early afternoon of January 6, Denney approached the police line on

---

[7] After arriving in D.C., Denney told a friend on Facebook messenger that the "DC police have joined forces with [ANTIFA]" (ECF #60-1, at 15). "Civil war," Denney proclaimed, was "here" and "W[W]3 isn't too far away" (*id.*).

[8] The Capitol Police set up a security perimeter around the Capitol on January 6 (ECF #60-1, at 1-2). "Only authorized people with appropriate identification [we]re allowed access inside the Capitol" (*id.* at 1).

the Capitol's west side and repeatedly pushed and pulled the metal barricades protecting the officers (ECF #60-1, at 16-17). A short time later, Denney approached the Capitol Police officers guarding the stairs leading to the Upper Terrace, "reach[ed] over the crowd," and extended his hand in the officers' direction; Denney was holding a "small object in his hand" (*id.* at 17), which a factfinder could reasonably infer was his pepper spray (see App. 101). Later, at around 2:13 p.m., Denney "grabbed [an] officer's baton and engaged in a tug-of-war over the baton with the officer" (*id.*). Around this time, Denney also threw a "small cannister" he had been holding "in the direction" of a line of officers (*id.*).

Soon thereafter, Denney assaulted Metropolitan Police Department Sergeant K.K. with a deadly or dangerous weapon, namely a PVC pole (see ECF #60-1, at 17-18). Before doing so, however, Denney tried to steal a crowd-control-spray cannister from Sergeant K.K., who was positioned between the mob and the Capitol's west side (*id.* at 17). In response, Sergeant K.K. deployed the spray and Denney briefly retreated (*id.* at 17-18). Denney soon returned, "picked up a long PVC pole from the ground," and swung it towards Sergeant K.K. (*id.* at 18):



Though Denney did not make contact with Sergeant K.K., he hit a photojournalist (*id.*). Sergeant K.K. and several other officers then tried to disarm Denney, but were unsuccessful (*id.*).

After throwing a "large tube" toward where Officer K.K. had been positioned less than a minute earlier, Denney reappeared at approximately 3:14 p.m. in the tunnel that connects the Capitol's Lower West Terrace and the Capitol's interior (ECF #60-1, at 18). Denney joined a group of rioters who were trying to overpower those officers protecting the Capitol (*id.*). As part of this pitched battle, Denney and "another

rioter pushed a riot shield into and on top [of] the line of officers for more than a minute" (*id.*).[9]

### Denney's Plea and Sentencing

At his change-of-plea hearing, Denney admitted that he did "in fact assault, resist, oppose, impede, intimidate or interfere" with a federal officer by "swinging a long pole" at Sergeant K.K. (3/17/22:24-25). Specifically, Denney admitted, it "was a plastic pole, it was like a PVC tube" (*id.* at 25). Further, Denney admitted, it was a "dangerous weapon" (*id.* at 26).

Based on a total offense level of 25 and a Criminal History category of I,[10] the Probation Office calculated Denney's Sentencing Guidelines

---

[9] The day after the January 6 riot, Denney admonished his codefendant – Hazard – "to keep qui[et]," adding "don't talk or message anything to anyone" (ECF #60-1, at 19). A week later, Denney again directed Hazard not to "talk about certain things to anyone" (*id.* at 20).

[10] Denney's base offense level was 14 and the Probation Office recommended several adjustments, including a two-level increase for his more-than-minimal planning, namely his "organizing, recruiting, soliciting donations, and purchasing protective gear" (ECF #47, ¶ 59). *See* U.S.S.G. § 2A2.2(b)(1). Additionally, the Probation Office recommended a four-level increase for Denney's use of a dangerous weapon (ECF #47, ¶ 60). *See* U.S.S.G. § 2A2.2(b)(2)(B). Denney objected to these enhancements (ECF #47, at 43-46).

range as 57 to 71 months (ECF #47, ¶¶ 70, 73, 108). The government advocated for a "significant term of incarceration," noting Denney was "far and beyond one of the most meticulous and extensive" January 6th "planners," having "recruited others," "fundraised," and "gathered weapons" in the months before January 6 (App. 72). Further, the "scope of his conduct" that day was "extensive" – he was "in several assaultive incidents punching officers, spraying officers, [and] lo[bbing] objects at officers" (App. 72-73). For his part, Denney asked the court not to sentence him to more than 24 months, labeling the government's arguments "hyperbole" (ECF #50, at 23-24, 34).[11]

The district court overruled Denney's objections to the Guidelines enhancements, see note 10 supra, and thus agreed his Guidelines range was 57-71 months (App. 34-52). Ultimately, however, the court varied down, sentencing Denney to 52 months' imprisonment (App. 102).

Beginning with the "nature and circumstances of [Denney's] offense," 18 U.S.C. § 3553(a)(1), Judge Moss declared it was "hard to

---

[11] In his allocution, Denney "apologize[d] for [his] conduct at the Capitol on January 6th" and asked the court to consider that his "actions on a single day of [his] 45-year life" did not "actually define [his] enduring character" (App. 94-95).

capture how truly disturbing" Denney's conduct was on January 6 (App. 96). Denney came to Washington, D.C., "looking for a fight" – he "engaged in planning," equipped himself for "battle" by "wearing tactical gear [and] a helmet," and carried pepper spray (App. 97-98). And, that fight "turned out to be an assault on our democracy" (App. 98). Moreover, though Denney's "assaultive behavior" may not have caused "any physical injuries," it undoubtedly led to the officers' "tremendous psychic injury" (App. 98). Further, Denney's actions "were multiple and sustained" – for "well over a period of a couple of hours," Denney "engaged in repeated assaultive actions" (App. 100). "[O]n at least two occasions, [Denney] discharged pepper spray directed at police officers" and, on another, he "punch[ed]" a police officer (App. 101). And, after Denney emerged from the tunnel battle, which, the court recognized, was just "horrifying" in terms of what those officers "went through," Denney "attempt[ed] to take a swing" at yet another officer (App. 101).

As for Denney's "history and characteristics," 18 U.S.C. § 3553(a)(1), the court recognized that he was a veteran, a single father, and had "no criminal record whatsoever" (App. 99). The court also

recognized that Denney had demonstrated "remorse" in his allocution (App. 99-100).

Finally, Judge Moss explained, he had spent "quite a bit of time" reviewing other January 6 sentences (App. 101-02). *See* 18 U.S.C. § 3553(a)(6). "[C]omparing" Denney's case to those others, the court concluded, a "slight[ ]" downward variance was warranted (App. 102). But, the court emphasized, only a small variance was appropriate because Denney's "attacks occurred in the context of an assault on our democracy, an assault on the Capitol, an assault on one of the most sacred events in our nation, and that resulted in injuries, not just to the psychic well being of the officers who . . . endured that assault, but to the nation as a whole" (App. 103). Accordingly, the court varied down five months from the 57-71 months range (App. 102).

## SUMMARY OF ARGUMENT

The district court correctly determined that Denney's offense level should be enhanced two levels for his more-than-minimal planning. Denney, in fact, engaged in substantial planning for his assault of Sergeant K.K. Specifically, Denney solicited donations to finance his trip to D.C. and to outfit his "guys" with, among other things, pepper spray

and helmets. Denney also recruited his codefendant, Donald Hazard, to serve as Denney's "sergeant at arms" on January 6. Denney engaged in this careful planning so he could travel to D.C. on the day of the electoral-college certification and "fight" to ensure that President Trump remained in power.

The district court also correctly enhanced Denney's base offense level because of his use of a dangerous weapon. Denney admitted at his plea hearing that he used a dangerous weapon and, contrary to his claim, the district court rightly found that he had the intent to cause bodily injury when he swung the long PVC pipe at Sergeant K.K.

## ARGUMENT

### The District Court's Below-Guidelines Sentence Is Procedurally Correct.

Denney alleges (at 11-20) the district court procedurally erred by improperly applying two enhancements, one for Denney's more-than-minimal planning and the other for his use of a dangerous weapon. This claim is meritless.

## A. Applicable Legal Principles and Standard of Review

In reviewing a sentencing challenge, this Court must verify that the district court "committed no significant procedural error," *Gall v. United States*, 552 U.S. 38, 51 (2007), which "includes failing properly to calculate the guideline range," *United States v. Washington*, 670 F.3d 1321, 1326 (D.C. Cir. 2012). Upon appeal of Guidelines enhancements such as Denney's more-then-minimal-planning and dangerous-weapon adjustments, "[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and [this Court is] to give due deference to the district court's application of the guidelines to facts." *United States v. Bikundi*, 926 F.3d 761, 796-97 (D.C. Cir. 2019) (citation omitted). "Due deference 'presumably falls somewhere between *de novo* and clearly erroneous.'" *Id.* at 797 (citation omitted).[12]

---

[12] Denney does not challenge his sentence's substantive reasonableness, which "is the catch-all criterion under which the reviewing court monitors (deferentially – for abuse of discretion) whether the district court has given reasonable weight to all the factors required to be considered." *United States v. Russell*, 600 F.3d 631, 633 (D.C. Cir. 2010).

**B.  The District Court Properly Applied the More-Than-Minimal-Planning Enhancement.**

Denney asserts (at 11-18) the court incorrectly enhanced his sentence two levels pursuant to U.S.S.G. § 2A2.2(b)(1), which applies if a defendant committed an aggravated assault – here, Denney does not contest his § 111 offense qualifies, *see id.* § 2A2.2(b)(1) cmt. n.1 – and "the assault involved more than minimal planning." "'[M]ore than minimal planning' means more planning than is typical for commission of the offense in a simple form." *Id.*

Contrary to Denney's argument, the district court correctly applied the § 2A2.2(b)(1) enhancement, concluding Denney "plann[ed] to come to D.C. to fight and to bring equipment and others" (App. 34-35). Specifically, the court properly reasoned, Denney knew or believed there would be a march to the Capitol on January 6, perhaps with President Trump in attendance, and in preparation for this, Denney "is getting helmets, body protective gear of some type, recruiting others to come with him, [and] getting pepper spray" (App. 39). "[T]hat," the court rightly concluded, "sure sounds like planning" (App. 39). Further, the court appropriately rejected as "completely implausible" Denney's claim that

"all of that planning [wa]s just as consistent with self-defense" (App. 39).

Denney "was the one instigating attacks on the police officers that day"

(App. 40).

The district court's determination that Denney engaged in more

than minimal planning is supported by the record and entitled to due

deference.[13] Denney's planning began soon after, as he explained to

codefendant Hazard, President Trump "'call[ed] for a big protest in DC

on January 6th,'" which, Denney understood, was "the day that Congress

[wa]s going to try and certify the electoral college" (ECF #60-1, at 5, 8).

Denney offered to pay Hazard's expenses and designated Hazard his

"sergeant at arms," which Denney said was the man who would "watch

[Denney's] back" (*id.* at 6). Denney could afford to travel to D.C. and pay

Hazard's expenses because, he bragged to Hazard, he had "got" a $1,000

"donation" for "the trip" (*id.*). In late-December 2020, Denney also asked

Hazard if he knew "any other guys that can go that[']s *like us an[d] will*

---

[13] *See United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994) (applying due deference to more-than-minimal-planning determination under U.S.S.G. § 2F1.1(b)(2)(A)); *United States v. Mellen*, 393 F.3d 175, 186 (D.C. Cir. 2004) (same as to U.S.S.G. § 2B1.1(b)(4)(A)).

*fight*" (*id.* at 7 (emphasis added)). If Hazard could recruit such "fight[ers]," Denney said he would also pay their costs (*id.*).

In addition to soliciting donations and recruiting personnel, Denney researched the District's weapons laws and procured combat supplies. After issuing a warning on Facebook to "everyone going to DC" not to bring guns – because, Denney explained, the District has "strict weapon laws" – Denney declared that "[p]epper spray is legal though" (ECF# 60-1, at 9). Accordingly, consistent with his own weapons advice, the next day Denney secured bottles of "police grade pepper spray" for both himself and Hazard (*id.*). Further, Denney planned to take Hazard to "get a helmet and pick up some other gear" (*id.*).[14]

Finally, in a number of pre-riot posts, Denney made clear the motivation for his assiduous planning: Denney would be joining the thousands of others travelling to D.C. on January 6 in order to "fight"

[14] See also ECF #60-1, at 10 (Denney's Dec. 30, 2020, Facebook message: "Been really busy organizing this trip . . . . Now trying to make sure all my guys have the right equipment they need."); *id.* at 11 (Denney's Dec. 30, 2020, Facebook message: "two of the guys that's going need helmets and vest and medical equipment"); *id.* (Denney's Dec. 30, 2020 Facebook message: "I'm still trying to take donations to get two helmets and stab proof vest that two guys need. And medical supplies.").)

those persons purportedly trying to steal the presidential election. In a series of late-December Facebook posts, for example, Denney said he was leaving for D.C. on January 4th and that his Patriot Boys of North Texas would be "linking up with thousands of Proud Boys and other militia," exclaiming "it's [i.e., January 6] going to be a fight" (ECF #60-1, at 8). Denney thereafter (on December 30) tried to post two captioned photographs of the Capitol, one of which declared that "election fraud is treason" and endorsed "occupy[ing] Congress" on January 6 (*id*. at 12). In a later post that same day, Denney said he couldn't wait to be "on the front line on the 6th" (*id*.). Indeed, Denney declared, "if we aren't" in D.C. on January 6, "ANTIFA and BLM will burn down that city" (*id*. at 13). Further, just two days before departing for D.C., Denney declared the "liberals and deep state Republicans" had "rigged th[e] election" and, if "[t]hey think we are just going to roll over and let that happen," "lol" (*id*. at 14-15). Rather, Denney explained, "we will be taking back the country on the 6th" (*id*. at 15). Denney also asserted that the "DC police ha[d] joined forces with [ANTIFA] per orders of the mayor" and a "[c]ivil war" was here (*id*.).

Because of his extensive planning, Denney was thus fully prepared to participate in his perceived "[c]ivil war" and assault, among others, Sergeant K.K. Certainly Denney's "planning exceeded the norm for aggravated assault," *United States v. Smith*, 953 F.2d 1060, 1066 (7th Cir. 1992), and he was not merely taking advantage of a last-minute opportunity. Rather, as the stipulated facts establish, Denney had a powerful motive for his assaultive conduct. Denney believed the election had been stolen and, he repeatedly declared, he would "fight" whomever – "liberals," "deep state Republicans," ANTIFA, BLM, or the "DC police" who had purportedly "joined forces" with ANTIFA – to ensure Trump remained President. Accordingly, well ahead of January 6, Denney began preparing for this fight by: recruiting like-minded combatants; researching D.C.'s weapons laws; and soliciting donations for the trip and, critically, the necessary supplies (e.g., "helmets, body protective gear of some type, . . . [and] pepper spray" (App. 39)). No doubt emboldened by this careful planning, which provided Denney with manpower, money, and combat gear, by the time he arrived at the Capitol on January 6 he was ready to fight anyone he perceived as standing in the way of a continued Trump presidency, including Sergeant K.K.

In sum, all of Denney's planning "does not describe an offense committed on the spur of the moment." *United States v. Foster*, 898 F.2d 25, 27 (4th Cir. 1990). To the contrary, Denney's aggravated assault of Sergeant K.K. was the end result of Denney's plan to travel to D.C. with the necessary support and combat paraphernalia to execute violence. Accordingly, the district court properly applied the two-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(1). *See United States v. Moore*, 225 F.3d 637, 642 (6th Cir. 2000) ("It is not necessary that a crime suggests planning in its most deliberative form; rather, it is sufficient if the evidence suggests merely that the crime was not committed in its simplest form.") (construing U.S.S.G. § 2B1.1(b)(4)).

Denney claims (at 13) the district court erroneously applied the § 2A2.1(b)(1) enhancement because the "factual basis for the 'planning'" relied upon by the court "did not involve 'planning' of the offense – it involved planning for a trip to a political protest where the potential for violence – *from counter-protestors* – could not be ruled out." Denney made this same argument below, contending "all" his planning was "just as consistent with self-defense" (App. 39). For several reasons, the court properly rejected this assertion, deeming it "implausible" (App. 39). First,

in numerous pre-riot messages Denney said he couldn't discuss his "special" January 6th "plans" over social media because his account might be monitored (ECF #60-1, at 16; see note 4 supra). As the court reasonably surmised, Denney was not concerned that, for example, ANTIFA was engaged in such monitoring, but rather "the government" (App. 39). Denney's "special" plans were thus not about self-defense measures but, as he declared in his subsequent posts, "taking back the country on the 6th" and not "roll[ing] over" in the face of purported election fraud (ECF #60-1, at 14-15). Second, the court correctly recognized, by January 6 Denney was "equating ANTIFA with the D.C. police," which confirmed that ANTIFA was just "a convenient, made up goblin to justify whatever [he was] doing" (App. 39-40). Finally, the court properly rejected Denney's self-defense contention because, as his January 6 actions amply demonstrated, "he was the one instigating attacks on the police officers that day" (App. 40). In sum, contrary to Denney's claim (at 15) that his copious planning involved preparations for a "political rally/protest" where violence *might* erupt, Denney planned to commit – and did commit – violence on January 6 (i.e., to "fight") to ensure "Trump w[ould] stay President" (ECF #60-1, at 14).

Denney additionally asserts (at 10, 13-14) there was no "direct connection between the planning and the offense conduct." Citing several out-of-circuit authorities,[15] he maintains (at 15-18) § 2A2.2(b)(1) requires "'planning'" that "was specific to bringing about the execution and success of the offense conduct," not "generalized planning" that "only provided an opportunity for spontaneous criminal activity." But Denney's extratextual additions – e.g., a "direct connection" and "specific to bringing about" – ignore the enhancement's plain terms: "If the assault *involved* more than minimal planning, increase by 2 levels." U.S.S.G. § 2A2.2(b)(1) (emphasis added). "The ordinary and plain meaning of 'involved' means 'to include.'" *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (citation omitted; construing U.S.S.G. § 3A1.4).[16]

---

[15] *United States v. Kanu-Bradley*, 2022 WL 1055179 (5th Cir. April 8, 2022); *United States v. Coombs*, 823 F. App'x 613 (10th Cir. 2020); *United States v. Simpson*, 760 F. App'x 931 (11th Cir. 2019); *United States v. Tapia*, 59 F.3d 1137 (11th Cir. 1995).

[16] *See also Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 274 (1995) (citing *Oxford English Dictionary* 466 (1st ed. 1933) as "providing examples dating back to the mid-19th century, where 'involve' means to 'include or affect in . . . operation'"); *United States v. Graham*, 275 F.3d 490, 516 (6th Cir. 2001) ("The word 'involved' occurs frequently throughout the Guidelines, both in the substantive provisions and in the commentary, and is typically employed to mean 'included.'").

Denney's aggravated assault of Sergeant K.K. certainly *included* more than minimal planning since it depended on, among other things, the money Denney solicited (which he used to finance his travel to, and lodging in, D.C.); the equipment he procured and brought with him (which facilitated his assault by protecting him from potential reprisals); and his solicitation of others (which contributed to the riotous mob that outnumbered the officers – including Sergeant K.K. – guarding the Capitol). Far from "an offense committed on the spur of the moment," *Foster*, 898 F.2d at 28, it thus took a significant amount of planning to get Denney to D.C. on the day of the electoral-college certification where he could effect his plan of "taking back the country" by, among other things, assaulting Sergeant K.K. with little fear of reprisal or identification (ECF #60-1, at 15).[17]

---

[17] Indeed, even several of the authorities Denney principally relies on establish that where a defendant has planned some larger criminal scheme, § 2A2.2(b)(1) is properly applied to an assault carried out in furtherance of that scheme. *See Kanu-Bradley*, 2022 WL 1055179, at *1 (assault of officer carried out during planned robbery); *Simpson*, 760 F. App'x at 935 (aggravated assault carried out during planned robbery).

### C. The District Court Properly Applied the Use-of-a-Dangerous-Weapon Enhancement.

Denney also claims (at 18-20) there was "an insufficient factual basis" for the U.S.S.G. § 2A2.2(b)(2)(B) enhancement because "the evidence did not support an intent to do bodily harm." Again, he is mistaken. As the United States explained below, an intent to cause bodily injury is not required to apply this enhancement (see ECF #63, at 8-9; App. 46). In any event, Denney certainly acted with such an intent.

For purposes of the use-of-a-dangerous-weapon enhancement, "'[d]angerous weapon' has the meaning given that term in § 1B1.1, Application Note 1[.]'" U.S.S.G. § 2A2.2 cmt. n.1. And, a dangerous weapon is defined in § 1B1.1 as "an instrument capable of inflicting death or serious bodily injury." U.S.S.G. § 1B1.1 cmt. n.1(E)(i). Denney understandably admitted at his change-of-plea hearing that his PVC pole was such a dangerous weapon,[18] because, as the government explained in its sentencing memorandum, the "pole, while bendable, was hard, and thick enough to be swung with force without breaking" and Denney

---

[18] See 3/17/22:26 (Q: "And do you also acknowledge that the pipe that you hit the officer with was a dangerous weapon?" A: "Yes, sir.")).

swung "the pole at Sergeant K.K.'s face, head, and torso" (ECF #63, at 8). Importantly, U.S.S.G. § 2A2.2's cross-reference (in application note 1) to § 1B1.1's "dangerous weapon" definition does not add extra requirements, such as an "intent to cause serious bodily injury." Instead, note 1 simply underscores that items *other than* inherently dangerous items can be used in a such a way that makes them dangerous weapons: "'***Dangerous weapon***' has the meaning given that term in § 1B1.1, Application Note 1, and *includes* any instrument that is not ordinarily used as a weapon (*e.g.*, a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury." U.S.S.G. § 2A2.2 cmt. n.1 (second emphasis added).

Even assuming § 2A2.2(b)(2)(B) requires proof of an intent to cause bodily injury, the district court did not clearly err in finding that Denney acted with it.[19] Though Denney argued he only used the pole to "try to strike the [chemical spray] out of [Sergeant K.K.'s] hands," the district

---

[19] *See Bikundi*, 926 F.3d at 796-97 ("factual findings are to be affirmed unless clearly erroneous"); *see also United States v. Love*, 593 F.3d 1, 8 (D.C. Cir. 2010) ("We review the district court's factual finding about Love's intent for clear error.").

court found that, at a minimum, Denney also "ha[d] the intent to cause at least bodily injury" (App. 48, 50). This finding is supported by the record and cannot be deemed clearly erroneous.

Both before Denney assaulted Sergeant K.K. and after, Denney engaged in violent conduct. For example, just 20 minutes before Denney attacked Sergeant K.K. with the PVC pole, Denney threw a "small cannister" at a line of police officers (ECF # 60-1, at 17). Similarly, after assaulting Sergeant K.K., Denney threw a "large tube" in that officer's direction and, later, "pushed a riot shield into and on top [of] the line of officers" guarding the tunnel (*id.* at 18). Given Denney's repeated attacks on a variety of officers protecting the Capitol, as government counsel noted below, "it defies logic to suggest that in a particular 15-second interval, Mr. Denney abandoned all intention of injuring the officers who were guarding the Capitol, and was focused solely on disarming Sergeant K.K." (App. 47).

Moreover, the district court's intent finding is consistent with Denney's motive for joining the riotous mob at the Capitol. As Denney explained in his social-media posts, he couldn't "wait to be in the middle of it on the front line on the 6th" and expected to be "fighting" that day to

"tak[e] back the country" (ECF #60-1, at 12, 15-16). The mob – including Denney – wasn't "just going to roll over" in the face of a purportedly "rigged" election (*id.* at 14-15). The court's finding that Denney intended to commit bodily injury when he attacked Sergeant K.K. with the pole is thus consistent with Denney's prediction that he would be "fighting" in a "[c]ivil war" on January 6 (*id.* at 15-16).

Finally, as the district court correctly reasoned, "even if" Denney's purpose was to "simply" disarm Sergeant K.K., Denney could still have also intended to cause bodily injury (App. 50). As Judge Moss explained, he had "watched the video many times" and Denney's "desire" was to "at least strike [Sergeant K.K.] at a minimum to get him to drop the [cannister] which would involve bodily injury" (App. 51). "[S]omeone who is swinging or dropping a large pipe at a police officer with the intention of even trying to knock a weapon out of their hands," Judge Moss correctly found, "is intend[ing] to commit bodily injury" (App. 50).

In sum, ample evidence supports the court's factual finding, which cannot be deemed clearly erroneous. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1033 (D.C. Cir. 2019) ("Findings that are plausible in light of the entire record are not clearly erroneous, so '[w]here there are two

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous[.]'" (citation omitted)); *In re Sealed Case*, 552 F.3d 841, 845 (D.C. Cir. 2009) ("'[J]udicial findings of fact are presumptively correct. . . . Pursuant to this presumption, a finding of fact will not be overturned as "clearly erroneous" unless, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."'" (citations omitted)).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BENET J. KEARNEY
Assistant United States Attorneys

/s/
DAVID B. GOODHAND
D.C. Bar #438844
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 5,630 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
DAVID B. GOODHAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, William L. Shipley, Esq., 808Shipleylaw@gmail.com, on this 27th day of November, 2023.

/s/
DAVID B. GOODHAND
Assistant United States Attorney

# A D D E N D U M

# ADDENDUM

## INDEX

U.S.S.G. § 1B1.1 ................................................................ A-1

U.S.S.G. § 2A2.2 ................................................................ A-5

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by  U.S. v. Booker,  U.S.,  Jan. 12, 2005

> United States Code Annotated
>     Federal Sentencing Guidelines (Refs & Annos)
>         Chapter One. Introduction, Authority, and General Application Principles (Refs & Annos)
>             Part B. General Application Principles

USSG, § 1B1.1, 18 U.S.C.A.

§ 1B1.1. Application Instructions

Currentness

**(a)** The court shall determine the kinds of sentence and the guideline range as set forth in the guidelines (*see* 18 U.S.C. § 3553(a)(4)*)*) by applying the provisions of this manual in the following order, except as specifically directed:

**(1)** Determine, pursuant to § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction. *See* § 1B1.2.

**(2)** Determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed.

**(3)** Apply the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three.

**(4)** If there are multiple counts of conviction, repeat steps (1) through (3) for each count. Apply Part D of Chapter Three to group the various counts and adjust the offense level accordingly.

**(5)** Apply the adjustment as appropriate for the defendant's acceptance of responsibility from Part E of Chapter Three.

**(6)** Determine the defendant's criminal history category as specified in Part A of Chapter Four. Determine from Part B of Chapter Four any other applicable adjustments.

**(7)** Determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category determined above.

**(8)** For the particular guideline range, determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution.

A-1

**(b)** The court shall then consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence. *See* 18 U.S.C. § 3553(a)(5).

**(c)** The court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole. *See* 18 U.S.C. § 3553(a).

**CREDIT(S)**

  (Effective November 1, 1987; amended effective January 15, 1988; November 1, 1989; November 1, 1990; November 1, 1991; November 1, 1993; November 1, 1997; November 1, 2000; November 1, 2001; October 27, 2003; November 1, 2003; November 1, 2006; November 1, 2010; November 1, 2014; November 1, 2018; November 1, 2023.)

**COMMENTARY**

<*Application Notes:*>

  <**1.** The following are definitions of terms that are used frequently in the guidelines and are of general applicability (except to the extent expressly modified in respect to a particular guideline or policy statement):>
  <**(A)** "Abducted" means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction.>

  <**(B)** "Bodily injury" means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought.>

  <**(C)** "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.>

  <**(D)** "Court protection order" means "protection order" as defined by 18 U.S.C. 2266(5) and consistent with 18 U.S.C. 2265(b).>

  <**(E)** "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g., a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).>

  <**(F)** "Departure" means (i) for purposes other than those specified in subdivision (ii), imposition of a sentence outside the applicable guideline range or of a sentence that is otherwise different from the guideline sentence; and (iii) for purposes of § 4A1.3 (Departures Based on Inadequacy of Criminal History Category), assignment of a criminal history category other than the otherwise applicable criminal history category, in order to effect a sentence outside the applicable guideline range. "Depart" means grant a departure.>

  <"Downward departure" means departure that effects a sentence less than a sentence that could be imposed under the applicable guideline range or a sentence that is otherwise less than the guideline sentence. "Depart downward" means grant a downward departure.>

**A–2**

<"Upward departure" means departure that effects a sentence greater than a sentence that could be imposed under the applicable guideline range or a sentence that is otherwise greater than the guideline sentence. "Depart upward" means grant an upward departure.>

<**(G)** "Destructive device" means any article described in 26 U.S.C. § 5845(f) (including an explosive, incendiary, or poison gas--(i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses).>

<**(H)** "Firearm" means (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device. A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.>

<**(I)** "Offense" means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context. The term "instant" is used in connection with "offense," "federal offense," or "offense of conviction," as the case may be, to distinguish the violation for which the defendant is being sentenced from a prior or subsequent offense, or from an offense before another court (e.g., an offense before a state court involving the same underlying conduct).>

<**(J)** "Otherwise used" with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.>

<**(K)** "Permanent or life-threatening bodily injury" means injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent. In the case of a kidnapping, for example, maltreatment to a life-threatening degree (e.g., by denial of food or medical care) would constitute life-threatening bodily injury.>

<**(L)** "Physically restrained" means the forcible restraint of the victim such as by being tied, bound, or locked up.>

<**(M)** "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, "serious bodily injury" is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law.>

<**2.** Definitions of terms also may appear in other sections. Such definitions are not designed for general applicability; therefore, their applicability to sections other than those expressly referenced must be determined on a case by case basis.>

<The term "includes" is not exhaustive; the term "e.g." is merely illustrative.>

<**3.** The list of "Statutory Provisions" in the Commentary to each offense guideline does not necessarily include every statute covered by that guideline. In addition, some statutes may be covered by more than one guideline.>

<**4.(A) Cumulative Application of Multiple Adjustments within One Guideline.**--The offense level adjustments from more than one specific offense characteristic within an offense guideline are applied cumulatively (added together) unless the guideline specifies that only the greater (or greatest) is to be used. Within each specific offense

**A–3**

characteristic subsection, however, the offense level adjustments are alternative; only the one that best describes the conduct is to be used. For example, in § 2A2.2(b)(3), pertaining to degree of bodily injury, the subdivision that best describes the level of bodily injury is used; the adjustments for different degrees of bodily injury (subdivisions (A)-(E)) are not added together.>

<**(B) Cumulative Application of Multiple Adjustments from Multiple Guidelines.**--Absent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively. In some cases, such enhancements, adjustments, and determinations may be triggered by the same conduct. For example, shooting a police officer during the commission of a robbery may warrant an injury enhancement under § 2B3.1(b)(3) and an official victim adjustment under § 3A1.2, even though the enhancement and the adjustment both are triggered by the shooting of the officer.>

<**5.** Where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level. E.g., in § 2A2.2(b)(2), if a firearm is both discharged and brandished, the provision applicable to the discharge of the firearm would be used.>

<**6. Use of Abbreviated Guideline Titles.**--Whenever a guideline makes reference to another guideline, a parenthetical restatement of that other guideline's heading accompanies the initial reference to that other guideline. This parenthetical is provided only for the convenience of the reader and is not intended to have substantive effect. In the case of lengthy guideline headings, such a parenthetical restatement of the guideline heading may be abbreviated for ease of reference. For example, references to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States) may be abbreviated as follows: § 2B1.1 (Theft, Property Destruction, and Fraud).>

<**Background:** The court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). **See** 18 U.S.C. § 3553(a). Subsections (a), (b), and (c) are structured to reflect the three-step process used in determining the particular sentence to be imposed. If, after step (c), the court imposes a sentence that is outside the guidelines framework, such a sentence is considered a "variance". **See Irizarry v. United States,** 553 U.S. 708, 709-16 (2008) (describing within-range sentences and departures as "sentences imposed under the framework set out in the Guidelines").>

Notes of Decisions (746)

Federal Sentencing Guidelines, § 1B1.1, 18 U.S.C.A., FSG § 1B1.1
As amended to 3-15-22.

---

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted  Limited on Constitutional Grounds by   U.S. v. Booker,   U.S.,   Jan. 12, 2005

> United States Code Annotated
>    Federal Sentencing Guidelines (Refs & Annos)
>       Chapter Two. Offense Conduct (Refs & Annos)
>          Part A. Offenses Against the Person
>             2. Assault

USSG, § 2A2.2, 18 U.S.C.A.

§ 2A2.2. Aggravated Assault

Currentness

**(a)** Base Offense Level: 14

**(b)** Specific Offense Characteristics

**(1)** If the assault involved more than minimal planning, increase by 2 levels.

**(2)** If (A) a firearm was discharged, increase by 5 levels; (B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels.

**(3)** If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury:

| | Degree of Bodily Injury | Increase in Level |
|---|---|---|
| **(A)** | Bodily Injury | add 3 |
| **(B)** | Serious Bodily Injury | add 5 |
| **(C)** | Permanent or Life-Threatening Bodily Injury | add 7 |
| **(D)** | If the degree of injury is between that specified in subdivisions (A) and (B), add 4 levels; or | |
| **(E)** | If the degree of injury is between that specified in subdivisions (B) and (C), add 6 levels. | |

However, the cumulative adjustments from application of subdivisions (2) and (3) shall not exceed 10 levels.

**(4)** If the offense involved strangling, suffocating, or attempting to strangle or suffocate a spouse, intimate partner, or dating partner, increase by 3 levels.

However, the cumulative adjustments from application of subdivisions (2), (3), and (4) shall not exceed 12 levels.

A–5

**(5)** If the assault was motivated by a payment or offer of money or other thing of value, increase by 2 levels.

**(6)** If the offense involved the violation of a court protection order, increase by 2 levels.

**(7)** If the defendant was convicted under 18 U.S.C. § 111(b) or § 115, increase by 2 levels.

**CREDIT(S)**

(Effective November 1, 1987; amended effective November 1, 1989; November 1, 1990; November 1, 1995; November 1, 1997; November 1, 2001; November 1, 2002; November 1, 2004; November 1, 2006; November 1, 2007; November 1, 2014.)

**COMMENTARY**

<**Statutory Provisions:** 18 U.S.C. §§ 111, 112, 113(a)(2), (3), (6), (8), 114, 115(a), (b)(1), 351(e), 1751(e), 1841(a)(2)(C), 1992(a)(7), 2199, 2291, 2332b(a)(1), 2340A. For additional statutory provision(s), see Appendix A (Statutory Index).>

<**Application Notes:**>

<**1. Definitions.**--For purposes of guideline:>

<"Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.>

<"Brandished," "bodily injury," "firearm;" "otherwise used," "permanent or life-threatening bodily injury," and "serious bodily injury," have the meaning given those terms in § 1B1.1 (Application Instructions), Application Note 1.>

<"Dangerous weapon" has the meaning given that term in § 1B1.1, Application Note 1, and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury.>

<"Strangling" and "suffocating" have the meaning given those terms in 18 U.S.C. § 113.>

<"Spouse," "intimate partner," and "dating partner" have the meaning given those terms in 18 U.S.C. 2266.>

<**2. Application of Subsection (b)(1).**--For purposes of subsection (b)(1), "more than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which § 3C1.1 (Obstructing or Impeding the Administration of Justice) applies. For example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location or wearing a ski mask to prevent identification would constitute more than minimal planning.>

**A–6**

<**3. Application of Subsection (b)(2).--**In a case involving a dangerous weapon with intent to cause bodily injury, the court shall apply both the base offense level and subsection (b)(2).>

<**4. Application of Official Victim Adjustment.--**If subsection (b)(7) applies, § 3A1.2 (Official Victim) also shall apply.>

<**Background:** This guideline covers felonious assaults that are more serious than other assaults because of the presence of an aggravating factor, i.e., serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; strangling, suffocating, or attempting to strangle or suffocate; or the intent to commit another felony. Such offenses occasionally may involve planning or be committed for hire. Consequently, the structure follows § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder). This guideline also covers attempted manslaughter and assault with intent to commit manslaughter. Assault with intent to commit murder is covered by § 2A2.1. Assault with intent to commit rape is covered by § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse.)>

<An assault that involves the presence of a dangerous weapon is aggravated in form when the presence of the dangerous weapon is coupled with the intent to cause bodily injury. In such a case, the base offense level and the weapon enhancement in subsection (b)(2) take into account different aspects of the offense, even if application of the base offense level and the weapon enhancement is based on the same conduct.>

<Subsection (b)(7) implements the directive to the Commission in subsection 11008(e) of the 21st Century Department of Justice Appropriations Act (the "Act"), Public Law 107-273. The enhancement in subsection (b)(7) is cumulative to the adjustment in § 3A1.2 (Official Victim) in order to address adequately the directive in section 11008(e)(2)(D) of the Act, which provides that the Commission shall consider "the extent to which sentencing enhancements within the Federal guidelines and the authority of the court to impose a sentence in excess of the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by" 18 U.S.C. §§ 111 and 115.>

Notes of Decisions (106)

Federal Sentencing Guidelines, § 2A2.2, 18 U.S.C.A., FSG § 2A2.2
As amended to 3-15-22.

---

**A-7**